John MATUSKA, Plaintiff,

v.

HINCKLEY TOWNSHIP,
et al., Defendants.

No. 1:97CV2150.

United States District Court,
N.D. Ohio,
Eastern Division.

July 28, 1999.

Ari H. Jaffe, Kohrman, Jackson & Krantz, Cleveland, OH, Susan L. Gragel, Robert J. Rotatori, Sr., Rotatori, Gragel & Stoper, Cleveland, OH, Natalie F. Grubb, Medina, OH, for plaintiff.

Thomas J. Wiencek, Brouse & McDowell, Akron, OH, for defendants.

### MEMORANDUM OF OPINION AND ORDER RE: GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

MATIA, Chief Judge.

This matter is before the Court pursuant to the defendants' motion for summary judgment (Doc. 46). The Court has con-

sidered the memorandum in support (Doc. 47), plaintiff's memorandum in opposition (Doc. 51), and defendants' reply memorandum (Doc. 54). The Court has also considered plaintiff's supplemental memorandum in opposition (Doc. 59), plaintiff's amended statement of facts [1] and defendants' supplemental memorandum in support (Doc. 60).[2] For the reasons that follow, the Court *GRANTS IN PART* defendants' motion for summary judgment.

## FACTUAL BACKGROUND

Plaintiff John Matuska ("Matuska") began his employment with defendant Hinckley Township (the "Township") as a laborer in July 1989. In September 1996, approximately seven years later, the Township terminated Matuska based upon the vote of its trustees. The Trustees contend that Matuska's refusal to return to work resulted in his termination. Matuska, on the other hand, contends that the Trustees terminated him in retaliation for filing discrimination charges and workers' compensation claims and thereby discriminated against him because he is disabled.

Matuska alleges that he suffers from physical and mental disabilities. The catalyst of Matuska's mental disabilities, however, were two (2) physical injuries. The first of the injuries occurred in January 1991 when Matuska suffered a work-related injury to his lower back. Amended Complaint at ¶ 10. Allegedly, this injury caused severe depression. *Id.* As a result of that accident, Matuska filed a workers' compensation claim. *Id.* at ¶ 10.

Shortly after he returned to work, Matuska suffered a second injury, allegedly due to "unsafe employer work practices." *Id.* at ¶ 12. This accident resulted in a finger amputation,[3] severe depression and Post Traumatic Stress Syndrome ("PTSS"). *Id.* Because of the amputation, Matuska alleges that he has substantial difficulty operating "trigger" finger devices, *e.g.*, drills and saws. Matuska filed a workers' compensation claim as a result of this accident also. *Id.*

In February 1993, defendants allegedly announced at a public meeting (and subsequently published in a local newspaper) that they denied Matuska a raise because he injured himself, and because he filed a Bureau of Workers' Compensation Claim and an Ohio Civil Rights Charge.[4] *Id.* at ¶ 13.

On July 27, 1993, Matuska, the defendants and the Equal Employment Opportunity Commission entered into a negotiat-

---

1. The Court ordered plaintiff to submit an amended statement of facts because the statement of facts contained within the memorandum in opposition (Doc. 51) was fraught with factual assertions that were either not supported by the record or the record supported the opposite assertion. *See* Order (Doc. 61).

2. The Court ordered the parties to submit additional briefing in support of their positions but limited the briefing to five (5) specific issues. *See* Order (Doc. 58). The Court further ordered plaintiff to submit his additional memorandum on or before October 2, 1998, and defendants to submit their memorandum on or before October 19, 1998. *See Id.* at 2. The Court recognizes that defendants moved the Court for summary judgment, and that arguably they should have submitted their memorandum first. However, the Court viewed the additional memoranda as a surreply and a reply to the surreply.

3. It is unclear whether Matuska's finger was completely amputated or only partially amputated. Apparently, he uses a permanent "non-functional prosthesis."

4. Plaintiff's amended complaint asserts that:

 the Plaintiff was humiliated when an announcement was made at a public meeting and subsequently published in the local newspaper that the Plaintiff was to be given no raise as he was hurt on the job and filed a Bureau of Workers' Compensation claim and the Plaintiff filed an Ohio Civil Rights Charge ... to which probable cause was found.

 It is unclear from the plaintiff's complaint whether he filed the Ohio Civil Rights Charge because of the announcement and article or whether the announcement and article cited that the plaintiff filed the charge and then listed the charge as a further reason for not giving the plaintiff a raise.

ed settlement agreement. *Id.* at ¶ 14. The settlement agreement provided that the defendants would formally apologize to Matuska on behalf of defendant George Van Deusen and that the defendants would not discriminate or retaliate against Matuska. *See Id.* and Exhibit 1 at ¶¶ 2 and 4. In exchange for these promises, Matuska agreed not to institute an action under Title II of the Americans with Disabilities Act of 1991 (the "ADA") or Chapter 4112 of the Ohio Rev.Code. Exhibit 1 at ¶ 1. Matuska alleges that the defendants refused to comply with the settlement agreement. Amended Complaint at ¶ 15.

On or about May 13, 1996, Matuska presented various employee complaints to the trustees at a township meeting. *Id.* at ¶ 19. Thereafter, on or about May 27, 1996, the defendants allegedly asked Matuska to resign. *Id.* at ¶ 20. Matuska asserts that the defendants refused to justify their resignation request and warned him that if he did not resign, they would "pack his workfile" [sic] with reprimands. *Id.*

Matuska began to suffer from panic attacks and was hospitalized on or about June 3, 1996, for acute depression and PTSS. *Id.* at ¶ 21. He alleges that during his hospital stay (and after his release) Hinckley police officers visited his home, left notes and notices with his children, and questioned family members as to his whereabouts, physical condition and other matters. *Id.*

As a result of his panic attacks and hospitalization, the Township granted Matuska twelve (12) weeks of unpaid medical leave. During this period of leave, the Trustees allegedly witnessed Matuska engaging in "normal social and life activities." Doc. 47 at 3. Seeing Matuska's behavior, the Trustees requested that he provide them with medical verification of his continued need for unpaid leave. Matuska's physician/psychiatrist, Dr. Tod Gates ("Dr.Gates") prepared a "written report" to substantiate his continued need for unpaid leave. *See* Doc. 62, Exh. 11.[5] It is this document that Matuska provided the Trustees as evidence of his medical/psychiatric condition.

Dissatisfied with Dr. Gates's report, the Township decided to have Matuska examined by an independent psychologist in July 1996. Doc. 47, Exh. 8. The psychologist, Dr. L. Ted Kemple ("Dr.Kemple"), determined that Matuska suffered from moderate to severe depression. He noted sleep disorders, preoccupation with his employment status and suicidal ideation. Dr. Kemple concluded that Matuska's current state of mind prevented him from returning to work.[6]

The panic attacks, depression and PTSS allegedly caused Matuska to use all of his available medical leave. Consequently, in August 1996 Matuska requested additional leave of up to three (3) months to deal with his mental impairments. Doc. 47, Exh. 9.

Defendants denied his request and ordered Matuska to return to work on September 3, 1996. Instead of complying, Dr. Gates sent additional letters to the Township indicating that Matuska could not return to work without accommodation for his disabilities. *Id.*, Exhs. 12 and 14. Counsel for defendants then attempted to contact Dr. Gates by telephone and by letter. Counsel requested that Dr. Gates schedule a meeting with him to determine the precise limitations caused by Matuska's alleged impairments and to discuss possible accommodations for those impairments. *Id.*, Exh. 13. Dr. Gates did not respond to counsel's requests for information and to set up a meeting.

---

**5.** The "written report" is actually a one (1) paragraph letter which is (at best) a vague and ambiguous description of Matuska's alleged mental impairments.

**6.** It should be noted that Dr. Kemple documents his failed attempts to meet with Dr. Gates and to retrieve relevant medical records from him concerning Matuska's psychiatric history. *See Id.* at 1.

The Trustees then contacted Matuska by letter and advised him that they had scheduled a meeting with their psychiatrist, Dr. Richard Lightbody ("Dr.Lightbody"), to investigate the extent and nature of his impairments and to determine if an accommodation was feasible. Dr. Lightbody determined that Matuska suffered from severe depression. *Id.*, Exh. 16. He further concluded that Matuska could not be accommodated because of his extreme disdain for the Trustees, and he noted that Matuska failed to identify any potential accommodations. *Id.*

Based upon Dr. Lightbody's report, the Trustees sent a letter to Matuska (allegedly delivered by a police officer) which requested that he either attend a meeting with the Trustees or be terminated. Amended Complaint at ¶ 23. Matuska's counsel represented him at the meeting in an attempt to reach a compromise. But at the meeting, the trustees gave Matuska a "Separation Agreement" that terminated his employment unless he returned to work. *Id.* at ¶ 24. Matuska claims that he attempted to discuss accommodations for his disabilities with the trustees, but they rebuffed him and argued that he had no disability under the ADA. Matuska did not return to work as directed by the Trustees; consequently, the Township terminated him.

7. As a preliminary note, the Court is unable to discern from the plaintiff's amended complaint which Counts are asserted against the trustees only, against Hinckley Township only and against all the defendants collectively.

8. The Court instructed the parties that no pendent state claims would be resolved by the Court on their merits but would be dismissed without prejudice upon the resolution of the federal and parallel state claims. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *see also Williams v. City of River Rouge*, 909 F.2d 151, 157 (6th Cir.1990). The parallel state claims, *i.e.*, plaintiff's claims of discrimination under Chapter 4112 of the Ohio Rev.Code, are generally analyzed under the same analytical framework as their parent federal claims.

## PLAINTIFF'S CLAIMS

Matuska asserts twelve (12) counts against the defendants seeking $3,000,-000.00 in damages.[7] Counts I–II and XII assert claims under federal law. Counts III–XI assert claims under Ohio law.[8] Count I asserts a cause of action under the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. §§ 12101 *et seq.*, for unlawful discrimination against disabled employees, and Count II seeks compensatory and punitive damages for that discrimination. Count XII asserts that defendants violated 42 U.S.C. § 1396 *et seq.*, by failing to mail Matuska his COBRA continuation benefits rights.

## LAW AND ANALYSIS

### I. STANDARD OF REVIEW

Fed.R.Civ.P. 56(c) governs summary judgment motions and directs the Court to grant summary judgment

if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law.

■ A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477

*Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm.*, 66 Ohio St.2d 192, 196, 421 N.E.2d 128 (1981). However, the Ohio Supreme Court recently held that Chapter 4112 provides for individual joint and several liability against supervisors for their personal acts of discrimination. *See Genaro v. Cent. Transport, Inc.*, 84 Ohio St.3d 293, 703 N.E.2d 782 (1999). Plaintiff's original complaint sought to hold the Trustees personally liable, but the Court dismissed them in their individual capacity prior to the Ohio Supreme Court's decision in *Genaro*. Plaintiff will be able to amend his complaint in state court to reassert his claims against the Trustees in their individual capacity. Consequently, the Court declines to exercise jurisdiction over any of plaintiff's state law claims.

U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Determination of whether it is "genuine" requires consideration of the applicable evidentiary standard. *Id.* at 252, 106 S.Ct. 2505. The Court must decide whether reasonable jurors could find that the nonmoving party is entitled to a verdict. In reviewing the motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party when deciding whether a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *White v. Turfway Park Racing Assn., Inc.,* 909 F.2d 941, 943–44 (6th Cir.1990).

"To withstand a motion for summary judgment the opposing party 'may not rest upon the mere allegations or denials' in its pleadings, but must respond 'by affidavits or as otherwise provided ... [setting] forth specific facts showing that there is a genuine issue for trial.' FedR.Civ.P. 56(e). [M]ere conclusory allegations are insufficient to withstand a motion for summary judgment." *Cincinnati Bell Telephone Co. v. Allnet Communication Services, Inc.,* 17 F.3d 921, 923 (6th Cir.1994) (*quoting McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1162 (6th Cir.1990)).

## II. MATUSKA'S ADA CLAIM

 The ADA mandates that:

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... [the] discharge of employees, ... and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). To withstand defendants' motion for summary judgment, Matuska must establish a *prima facie* case of discrimination by establishing that:

(1) he is disabled;

(2) he is otherwise qualified for the position, with or without reasonable accommodation;

(3) he suffered an adverse employment decision;

(4) the employer knew or had reason to know of his disability; and

(5) the position remained open while the employer sought other applicants or the disabled individual was replaced.

*Monette v. Electronic Data Sys. Corp.,* 90 F.3d 1173, 1186 (6th Cir.1996).

 If Matuska successfully establishes a *prima facie* case of discrimination, the burden shifts to the employer to proffer a legitimate nondiscriminatory reason for its conduct. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Should the defendant carry this burden, Matuska must then have an opportunity to prove by a preponderance of the evidence that the reasons proffered by the defendants were a pretext for discrimination. *Id.* However, "[a] reason cannot be proven to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *Pierce v. Commonwealth Life Insurance Co.,* 40 F.3d 796, 804–5 (6th Cir. 1994) (*citing St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 2751, 125 L.Ed.2d 407 (1993)). Finally, while the burden of production shifts between the parties, the ultimate burden of proving discrimination remains always with the plaintiff. *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089.

Defendants do not dispute the third or fifth elements of the *prima facie* case, but they vigorously contend that Matuska cannot establish the first, second or fourth elements, *i.e.,* whether he has a disability under the ADA; whether he is otherwise qualified for the position, with or without reasonable accommodation; or whether the defendants knew or had reason to know of his disability.

The Court will address each of these arguments in consecutive order. The Court will then address defendants' additional basis for moving the Court for summary judgment on Matuska's ADA claim, *i.e.*, whether Matuska can prove by a preponderance of the evidence that defendants' decision to terminate him was a pretext for discrimination. Lastly the Court will address defendants' contention that Matuska cannot establish a viable claim under COBRA (Count XII).

### A. The Prima Facie Case

### 1. Is Matuska Disabled?

■ The ADA defines a "disability" as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). Matuska asserts that he has physical and mental impairments that substantially limit his ability to work.[9] Specifically, Matuska maintains that he experiences pain, stressful breathing, loss of sleep, loss of concentration, loss of weight and appetite, vision problems, social isolation, distraction and loss of memory, depression and post-traumatic stress disorder. *See* Doc. 59 at 2.

Certainly these conditions constitute physical and mental impairments. But the critical issue to determine under the ADA is whether these impairments substantially limit Matuska's ability to work. Defendants vigorously argue that they do not, and the Court agrees.

The Supreme Court of the United States recently clarified (and considerably nar-

rowed) the meaning of the phrase "substantially limits" as used in Section 12102(2). *Sutton v. United Air Lines, Inc.*, —— U.S. ——, 119 S.Ct. 2139, —— L.Ed.2d —— (1999). First, the Court held that

the language is properly read as requiring that a person be presently—not potentially or hypothetically—substantially limited in order to demonstrate a disability. A "disability" exists only where an impairment "substantially limits" a major life activity, not where it "might," "could," or "would" be substantially limiting if mitigating measures were not taken. A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently "substantially limits" a major life activity. To be sure, a person whose physical or mental impairment is corrected by mitigating measures still has an impairment, but if the impairment is corrected it does not "substantially limi[t]" a major life activity.

*Id.* at 2146. The Court continued:

The definition of disability also requires that disabilities be evaluated "with respect to an individual" and be determined based on whether an impairment substantially limits the "major life activities of such individual."

*Id.*

Accordingly, the Court must decide whether Matuska's impairments substantially limited him in his ability to work while he was employed by the Township. The Court cannot consider (as suggested by Matuska) whether he would be substantially limited in his ability to work if he discontinued his medication. *See* Memorandum in Opposition at 11. Accordingly,

---

**9.** Matuska asserted that he had a disability because of "having (1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; and/or (3) being regarded as having such an impairment." Amended Complaint at ¶ 30. As more fully discussed below, Matuska failed to demonstrate that he has an impairment that substantially limits one or more of the major life activities. Consequently, the Court will only address whether Matuska satisfied the first prong of the definition because he failed to offer any evidence to establish that he had a record of, or that defendants regarded him as, having such an impairment.

if Matuska has failed to present evidence to the Court which would establish that he is substantially limited in his ability to work, the Court must find that defendants are entitled to judgment as a matter of law.

To guide the courts in this analysis, the Supreme Court elaborated on the meaning of the phrase "substantially limited" when the major life activity under consideration is that of working. In this context the Court stated that:

> the statutory phrase "substantially limits" requires, at a minimum, that plaintiffs allege they are *unable to work in a broad class of jobs* .... To be substantially limited in the major life activity of working, then, *one must be precluded from more than one type of job, a specialized job, or a particular job of choice.* If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs (emphasis added).

*Sutton,* at 2150; *see also McKay v. Toyota Motor Mfg.,* 110 F.3d 369 (6th Cir.1997); 29 C.F.R. § 1630.2(j)(3)(i). According to *Sutton,* then, Matuska must allege and prove that his physical and mental impairments prevented him from working in a broad class of jobs. *Sutton,* at 2151.

The Court has thoroughly reviewed Matuska's amended complaint and the record before it and finds that Matuska failed to allege or prove that his impairments preclude him from working in a broad class of jobs. In fact, Matuska's own testimony and arguments prove that the opposite is true—Matuska is not precluded from working *any* type of job.

Matuska states in his supplemental brief in opposition (Doc. 59) that:

> In general, reasonable accommodations are required because [Matuska] believes that *he can still use the same tools, and that some things take longer, but that he is merely impaired* and requires some accommodations (emphasis added).

Supplemental Memorandum in Opposition at 5 (*citing* Plaintiff's Exh. 1, Matuska Dep., at 201 and 206).

Matuska's deposition testimony buttresses the Court's finding that Matuska is not precluded from working in a broad class of jobs. For example, in response to inquiries from counsel for defendants, he states that:

Q. [T]he physical injury was the amputation of one of your left hand fingers; correct?

A. Yes.

Q. That was the first joint of the left finger?

A. Correct.

Q. How has that limited your ability to function in various classifications of jobs?

A. I've had to make adjustments and compensate for certain things, do certain things right-handed that I normally do left-handed.... Any kind of hand tools are out of balance now.... It would take longer.

Q. Would [the amputation of your finger] prevent you from operating snow removal equipment as needed?

A. No.

Q. Can you still rake?

A. I could still rake. It might not be as coordinated and take longer, but it hasn't had an impact on that.

Q. How about a shovel? Can you still shovel?

A. Not too much.

Q. Did you use a shovel in your job?

A. Yes.

Q. How does that injury to your finger prevent you from using a shovel?

A. It doesn't prevent me from using it. It's a question of adaption.

Q. But you can adapt to using a shovel; correct?

A. Yeah.

Q. How does the finger prevent you from using a chain saw?

A. Prevent? It doesn't prevent. It was a lot harder. I had more trouble starting it.

Q. How does it prevent you from using [the chainsaw in] cutting down trees or chopping wood or limbs?

A. It doesn't prevent me, but [it requires adjustments].

Plaintiff's Exh. 1, Matuska Dep. at 191–94. Matuska's responds in similar fashion to further questions relating to his physical impairment. For example, his physical impairment does not prevent him from operating a grinder, drills, saws, picks or a backhoe. *See Id.* at 194–201. In summary, Matuska concedes that his physical impairment *does not* prevent him from operating *any* of the tools that his job with the township required him to utilize. *Id.*

After thoroughly questioning Matuska on the effects of his physical impairment, counsel for defendants proceeded to inquire as to the nature and extent of Matuska's precise limitations resulting from his mental impairments. Again, the answers demonstrate that Matuska's mental impairments do not prevent Matuska from performing any of the functions that his job required of him. *Id.* at 204–29. Certainly there was an effect, but that effect was limited to forcing himself to deal with his fear and anxiety over the loss of a portion of his finger.

■ When a physical or mental impairment does not prevent an individual from performing any specific (or even minute) functions of one's job, then that individual cannot be found to be precluded from performing a broad class of jobs. To find as such would eviscerate the meaning of the phrase "substantially limits." Consequently, the Court finds that Matuska *is not* substantially limited in his ability to work; therefore, he is not disabled under the ADA.

As stated earlier, the Court ordered the parties to submit additional briefing regarding five (5) specific issues. The first two (2) issues were:

(1) Whether the plaintiff's physical and mental conditions substantially limit his ability to work, *i.e.*, what were plaintiff's precise limitations?

(2) Whether plaintiff is significantly restricted in his ability to perform either a class of jobs or a broad range of jobs in various classes when plaintiff is compared to the average person having comparable training, skills and abilities?

*See* Order (Doc. 58) at 1.

Affirmatively establishing these two (2) issues was pivotal for Matuska to establish that he had a disability under the ADA. To guide the parties, the Court instructed them to answer the first and second inquiries in nonconclusory fashion. *Id.* Additionally, the Court instructed the parties to respond in a clear and concise manner, and to specifically set forth the factual and legal basis for their respective positions. *Id.* at 2.

In support of whether his impairments substantially limit his ability to work, Matuska offered only conclusory arguments and irrelevant narratives of the extent of his disabilities. Specifically, Matuska quoted excerpts from two (2) psychological reports/evaluations from Drs. John Wilson and Gates. Neither of these excerpts, however, address whether Matuska's impairment(s) substantially limit his ability to work. Further, Matuska failed to proffer any evidence to demonstrate the precise limitations of his impairments.

In response to the Court's second inquiry, Matuska again offers only conclusory allegations. He failed to offer a scintilla of evidence that would prove that he is significantly restricted in his ability to perform either a class of jobs or a broad range of jobs in various classes. Defendant, on the other hand, submitted excerpts from Matuska's own deposition which (as discussed above) establish that he *was not* substan-

tially limited in his ability work. Accordingly, Matuska failed to establish that he has a disability under the ADA.

## 2. Is Matuska otherwise qualified for the position, with or without reasonable accommodations?

 Defendants contend that Matuska is not a qualified individual with a disability. To satisfy this element of the *prima facie* case, a plaintiff must "establish that a 'reasonable' accommodation is possible, and bears a traditional burden of proof that he is qualified for the position with such reasonable accommodation." *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1186 n. 12 (6th Cir.1996). The employee must only "suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Cehrs v. Northeast Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 781 (6th Cir.1998) (*citing Borkowski v. Valley Cent. School Dist.*, 63 F.3d 131, 138 (2d Cir.1995)). If the employee demonstrates that a reasonable accommodation is possible, then the employer must show that the suggested accommodation imposes an undue hardship on the employer. *Monette*, 90 F.3d at 1186 n. 12.

Defendants first argue that Matuska is unqualified for the position because he refuses to accept the Trustees' supervision of him, and he is unable to effectively communicate with them. In support of their argument, defendants direct the Court to Matuska's deposition testimony. *See* Memorandum in Support at 13 (Doc. 47). The ADA defines "qualified individual" as

an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are

essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111.

Communicating and cooperating with the Trustees (and being supervised by them) were essential job functions of Matuska's position with the Township. *See* Brief in Support (Doc. 60) at 6–7; Exhs. 3–4.[10] It is evident from the record before the Court that Matuska's relationship with the trustees was contentious, to say the least. He considered them to be dishonest and disloyal. Moreover, Matuska experienced severe difficulty in communicating with the Trustees on any level except through his physician. *See* Matuska Dep. at 78–80, 287:1–2 (Doc. 47, Exh. 1).

Thus, the evidence establishes that Matuska was unable to perform the essential job functions of the position. The Court finds, therefore, that Matuska was not qualified for the position from which he was terminated. Consequently, he failed to establish the third element of his *prima facie* case.

The Court also finds that Matuska failed to fulfill his obligations under the ADA in identifying the precise limitations of his impairment(s) and suggesting to the defendants the existence of a reasonable accommodation.

Matuska's treating psychiatrist and physician, Dr. Gates, sent at least two (2) letters to the Trustees which informed them that he had not released Matuska to return to work. *See* Doc. 59, Exhs. 13 and 14. The letters also informed the Trustees that Matuska would have to be accommodated before Dr. Gates would provide a work release. *Id.* But Dr. Gates concedes that he never provided the Township with

**10.** The Court ordered the parties to provide it with "the essential job requirements of plaintiff's position." *See* Order (Doc. 58). Yet, nowhere within Matuska's supplemental memorandum in opposition does he provide the Court with this information. Consequently, the Court must rely upon the list of job requirements provided by the defendants.

the details describing plausible accommodations for Matuska. Doc. 60, Exh. 10 at 89, 91–4.

In response to Dr. Gates's letters, counsel for defendant attempted to coordinate a meeting with Dr. Gates to discuss Matuska's impairments and need for accommodations. The evidence submitted by defendants demonstrates, however, that Dr. Gates failed to respond to counsel. *See* Docs. 59, Exh. 14, and 60, Exh. 7. Consequently, defendants had two (2) independent psychologists/psychiatrists evaluate Matuska to determine what were the precise limitations of his alleged impairments and to determine whether the Township could accommodate those impairments. *See* Doc. 47, Exhs. 8, and 15–17.

Based upon the psychological assessments of those doctors, the Township concluded that Matuska was not disabled under the ADA. The Township also concluded that no reasonable accommodation was possible because Matuska could not interact and cooperate with the Trustees. *Id.*

The evidence further demonstrates that Matuska failed to request reasonable accommodations. For example, he admitted that he never asked for an accommodation directly from the Trustees. Doc. 60, Exh. 1 at 282:10–14. Matuska vaguely recalls requesting some type of accommodation from Drs. Lightbody and Kempel (*see* Doc. 59, Exh. 1 at 284:2–19), but then later admits that he could not remember ever having requested an accommodation from either of them. *See* Id. at 294:2–14; 298:2–8. Surprisingly, Matuska does not recall ever speaking with Dr. Gates (his own physician) about possible accommodations.

 Matuska's unwillingness to identify the precise limitations of his impairment(s) and his failure to suggest reasonable accommodations that could overcome those limitations, made it impossible for the Township to accommodate him. *Cf. Cassidy v. Detroit Edison Co.,* 138 F.3d 629, 635 (6th Cir.1998). The ADA does not require the employer to speculate as to the extent of the employee's disability or the employee's need for an accommodation. *Gantt v. Wilson Sporting Goods Co.,* 143 F.3d 1042, 1046–47 (6th Cir.1998). Only after an employee requests a reasonable accommodation, must the employer make a reasonable effort to satisfy the employee's request. *Id.; see also* 29 C.F.R. § 1630.9(a).

The Court finds that the lack of cooperation by Dr. Gates and Matuska in defining the precise limitations of his impairments or in suggesting a reasonable accommodation absolves the defendants of their obligation to come forward with a reasonable accommodation. Based upon the foregoing, the Court finds that Matuska failed to establish that he is qualified for the position, with or without reasonable accommodation.

### 3. Did the Trustees know or have reason to know of Matuska's disabilities?

 To satisfy this element of the *prima facie* case, Matuska must show that defendants knew of his substantial physical or mental limitation. The ADA distinguishes between knowledge of a disability versus knowledge of any limitations which the employee experiences as a result of that disability. *See* 42 U.S.C. § 12112(b)(5)(A); *Taylor v. Principal Financial Group, Inc.,* 93 F.3d 155, 164 (5th Cir.1996). The distinction is significant because the ADA only requires employers to accommodate the known physical or mental limitations of the employee. 42 U.S.C. § 12112(b)(5)(A). Accordingly, if Matuska failed to inform the defendants of the limitations that he experienced as a result of his physical and mental impairments, then he cannot establish that the defendants knew or had reason to know of his disability.

The Court found in Parts 1 and 2 above that neither Matuska nor his physician/psychiatrist ever advised the defendants of the precise limitations resulting

from his impairments. Clearly, defendants were aware that Matuska had suffered an injury on the job and was depressed because of the amputation. But knowledge of the impairments does not amount to knowledge of the limitations that resulted from those impairments. The Court finds, therefore, that the defendants did not know or have reason to know of Matuska's disabilities.

Based upon the foregoing analysis, the Court finds that Matuska failed to prove either the first, second or fourth element of a *prima facie* case under the ADA. Defendants contend, however, that even if Matuska had established all of those elements, he still cannot rebut their legitimate nondiscriminatory reason for terminating him.

### B. Plaintiff's Failure to Show Pretext

Assuming, *arguendo*, that Matuska successfully established a *prima facie* case of discrimination, the burden shifts to the Township to proffer a legitimate nondiscriminatory reason for terminating him. *Burdine*, 450 U.S. at 252–53, 101 S.Ct. 1089. Should the Township carry this burden, Matuska must then have an opportunity to prove by a preponderance of the evidence that the reasons proffered by the defendants were a pretext for discrimination. *Id.*

The Township asserts that it terminated Matuska for refusing to return to work. At the meeting held between the Trustees and Matuska on September 27, 1997, the Township informed Matuska that if he failed to return to work on or before September 30, 1997, it would terminate him. Matuska did not return to work as ordered. Yet, he had taken all of his paid leave, a significant amount of unpaid leave[11] and still refused to perform his job.

The Court finds that Matuska's failing to report to work constituted a legitimate nondiscriminatory reason for terminating him.

Therefore, Matuska must rebut the defendants' legitimate nondiscriminatory reason for terminating him by proving by a preponderance of the evidence that the reason was false *and* that the true reason for terminating him was a discriminatory *animus* towards him based upon his disabilities. *Pierce*, 40 F.3d at 804–05. Matuska failed to make this showing. There is simply no evidence to indicate that the Trustees discriminated against him on the basis of his impairments. On the contrary, the evidence suggests that the Trustees attempted to work with Matuska, but that he could not overcome his obsession with his accident.[12]

Even if Matuska could point to some relevant evidence from which a jury could draw an inference of discrimination, he cannot show that the reason proffered by the defendants was false. Undeniably, Matuska failed to report to work. It was that conduct which precipitated his discharge.

Hypothetically speaking, Matuska could argue that he failed to return to work because his impairments prevented him from doing so. But an employer may fire a person for his conduct even where that conduct is related to the employee's disability. *Maddox v. Univ. of Tennessee*, 62 F.3d 843, 848 (6th Cir.1995). Accordingly, Matuska would have to prove that his discharge was actually based on his alleged disability. Based upon the record before the Court, there is no evidence to suggest that the Trustees discharged Matuska because of his impairments. The Court

---

11. As stated, *supra,* Matuska was originally granted twelve weeks of unpaid medical leave. *See* Doc. 47 at 3 and Exh. 4. The Township granted this leave on June 14, 1996. *Id.* The Township terminated Matuska on September 30, 1996. Accordingly, he remained at home for over fifteen weeks before the Township discharged him.

12. Matuska proffers evidence that suggests that the Trustees may have been upset or frustrated with Matuska for filing workers' compensation claims and employee grievances. But this evidence does not amount to a showing of a discriminatory *animus*.

finds, therefore, that Matuska has failed to rebut defendants' legitimate nondiscriminatory reason for terminating him.

## III. MATUSKA'S COBRA CLAIM

 Matuska alleges that defendants failed to provide him notice of his rights for continuation of coverage under the Consolidated Omnibus Budget Reconciliation Act ("COBRA").

29 U.S.C. § 1161 provides that:

> The plan sponsor of each group health plan shall provide ... that each qualified beneficiary who would lose coverage under the plan as a result of a qualifying event is entitled, under the plan, to elect, within the election period, continuation coverage under the plan.

In accordance with this section then, the Township was responsible for ensuring that Matuska received notice of his rights to continued coverage. But Matuska alleges that he never received such notice. The Township, on the other hand, contends that it informed the plan administrator that a qualifying event had occurred (Matuska's termination). The plan administrator, American Medical Security, likewise contends that *"[o]ur records* indicate that on October 9, 1996 I mailed a COBRA letter, notice and election form to John A. Matuska ... on behalf of Hinckley Township." Doc. 47, Exh. 18 (emphasis added). Conspicuously absent from the evidence submitted by the defendants are any such records that support this averment.[13]

Consequently, the Court finds that a genuine issue of fact exists as to whether the plan administrator mailed the notice to Matuska. Accordingly, summary judgment on this claim is inappropriate.

Complaint—Violation of COBRA. As previously mentioned, the pendent state law claims will be dismissed without prejudice upon resolution of the remaining federal claim.

IT IS SO ORDERED.

---

13. Assuming these records exist, defendants are well advised to produce them at trial.